**Exhibit 1**



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
OFFICE OF PETITIONS

Patent No.          :    5,481,890

Inventor            :    Norman A. Millman

Issue date          :    January 9, 1996

Application No.     :    029,545

Filed               :    March 11, 1993

**STATEMENT IN SUPPORT OF PETITION TO ACCEPT
UNAVOIDABLY DELAYED PAYMENT OF MAINTENANCE FEES**

Mail Stop Petition
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

RECEIVED

FEB 1 2 2004

OFFICE OF PETITIONS

Dear Sir:

Petitioner, Norman A. Millman, respectfully petitions the Commissioner to accept the delayed payment of the first and second maintenance fees for the above-identified U.S. Patent, pursuant to 37 C.F.R. § 1.378(b)(3). As will be shown, a delay in payment of the first and second maintenance fees was unavoidable, and hence, Petitioner respectfully requests that the maintenance fees be accepted.

I.    **BACKGROUND FACTS.**

In late 1992-early 1993, Norman A. Millman ("Millman"), the inventor and owner of the above-referenced patent, retained Paul Maleson, Esq. ("Maleson") to provide representation in connection with certain patent matters, including the prosecution of the

application that led to U.S. Patent No. 5,481,890 (the "'890 Patent"). (Millman Decl. at ¶ 2; Maleson Decl. at ¶ 2.) Because Millman was not familiar with patent practices and procedures, Millman relied upon Maleson with respect to all matters relating to the '890 Patent, including all communications with the PTO. (Millman Decl. at ¶ 2.)

On or about January 16, 1996, Maleson prepared a letter advising Millman of his receipt of the formal ribbon copy of the '890 Patent. (Maleson Decl. at ¶ 3.) As was his standard practice when a patent issued, Maleson advised Millman, in the above-mentioned letter, of the requirement to pay a first maintenance fee to the PTO in order to keep the '890 Patent in effect and that he would attempt to contact Millman when the payment was due. (Id.) While Millman did receive this letter and the ribbon copy of the patent, however, Millman did not understand from these materials that any obligation was required of him in connection with the maintenance of '890 Patent. (Millman Decl. at ¶ 3.) All that Millman understood at that time was that the '890 Patent had issued, that Maleson would be responsible for communications with the PTO and that Maleson would counsel Millman in this regard. (Id.)

Since 1998, Maleson -- a former patent examiner from 1953-1955 and a patent attorney since 1955 -- has been a sole practitioner. (Maleson Decl. at ¶ 1, 4.) During this time period, the control

established by Maleson to manage maintenance fees for his clients was a docketing system administered by Maleson himself, which primarily consisted of an electronic "due list" on his computer. (Id. at ¶ 5.) For each item, this list included identifying information, notation of the type of Action or Response due, and the "first date" and "last date" involved. (Id.) The list is kept sorted by "first date" with the nearest of those dates at the top of the list. (Id.) There was no time limit for entries. (Id.) The list was opened and updated each time a step was taken. (Id.) If some later step was due (either by Maleson or the PTO), the new date and type entries for that matter replaced the former entries, and the list was sorted as described above. (Id.) If no further steps were in order, the entire entry line was deleted. (Id.) The list was routinely consulted at once a month, usually toward the end of a month. (Id.) If a step ("first date") was due in the ensuing month, Maleson routinely printed out the list for his desktop. (Id.) For the ensuing month, Maleson made a notation on a desktop calendar/planner, marking the first due date and one week prior to that date. (Id.) The working file(s) pertaining to the particular matter, which contained the documents, including copies of correspondence with the patentee or other client and/or the PTO, had a docket history on the cover, including any due date. (Id.)

When a new patent issued, new entries regarding the next-due maintenance fees were entered by Maleson on the appropriate dates

on the electronic calendar and the relevant file for the patent, as described above. (Id. at ¶ 6.) In addition, Maleson routinely noted the next-due maintenance fee year, month and day due date on the last page of the current year's monthly calendar to be transferred forward year by year to the monthly paper calendars as appropriate. (Id.) If a maintenance fee was due, a letter or provisional bill was sent to the patentee or assignee, advising and requesting whether the payment should be made. (Id. at ¶ 7.) Maleson would comply with the instructions given. (Id.) If Maleson was not to pay the maintenance fee, Maleson deleted the entries applicable to the patent from the above-mentioned calendars. (Id.) If Maleson was instructed to pay the maintenance fee, he sent a transmittal letter to the PTO along with a check in the amount of the maintenance fee. (Id.)

Maleson's docketing system was reliable. (Id. at ¶ 8.) Maleson never encountered any faults in this docketing system, and to the best of his recollection, Maleson never has improperly failed to pay a maintenance fee when instructed to pay one. (Id.)

In July 1999, as was his standard practice, Maleson inspected his calendars to determine whether any maintenance fees were due. (Id. at ¶ 9.) Maleson observed that the first maintenance fee was due for the '890 patent, and accordingly, he prepared a letter on or about July 14, 1999 advising Millman of the same. (Id.) However, it is unknown whether this letter was ever mailed to

Millman, because Millman never received such a letter from Maleson. (Millman Decl. at ¶ 4.)  According to and consistent with Millman's records and the files that Maleson previously maintained, Maleson never sent, nor did Millman receive, such a letter.  (Id.)  While Maleson has no current recollection of whether such a letter was mailed, he has no reason to believe that he deviated from his normal practice which was to send this letter to Millman, as a search of his archived records shows the existence of an unsigned electronic copy of such a letter.  (Maleson Decl. at ¶ 9, Ex. 2.)

After receiving no response from Millman regarding the maintenance fee, Maleson believed that Millman had no intention of having Maleson maintain the '890 Patent.  (Id. at ¶ 10.)

In or around October 2000, Millman terminated his attorney-client relationship with Maleson and requested that all of his files be returned to him via an intermediary.  (Millman Decl. at ¶ 6; Maleson Decl. at ¶ 11.)  Maleson complied.  (Millman Decl. at ¶ 6; Maleson Decl. at ¶ 11.)  Once Millman received the files from Maleson, Millman placed them in storage for safekeeping.  (Millman Decl. at ¶ 6.)

In or around October 2003, Millman contacted Harold H. Fuller, Esq. ("Fuller") regarding an invention which was an improvement upon the invention that was the subject of the '890 Patent.  (Id. at ¶ 7.)  During their dialogue, Fuller had discovered that the '890 Patent had lapsed for failure to pay the first maintenance



fee, and he advised Millman of the same. (Id.) Upon learning of the lapse, Millman collected and searched through all of the files retrieved from Maleson and through his own records. (Id.) In addition, Fuller investigated the matter on Millman's behalf by ordering a copy of the file history of the '890 Patent and attempting to contact Maleson. (Id.) Thereafter, Millman retained present counsel to further investigate the matter. (Id.) This investigation into the facts surrounding the failure to pay the maintenance fees for the '890 Patent involved a considerable amount of time, due in large part to the unavailability of Maleson, who, unfortunately, has been disabled due to a severe back ailment for the past few months. (Millman Decl. at ¶ 7; Maleson Decl. at ¶ 13.)

## II. THE FAILURE TO PAY THE MAINTENANCE FEES FOR THE '890 PATENT WAS UNAVOIDABLE.

35 U.S.C. § 41(c)(1) governs reinstatement of a lapsed patent, and that section provides in relevant part that "[t]he Commissioner may accept the payment of any maintenance fee required by [35 U.S.C. § 41(b)] which is made . . . at any time after the six-month grace period if the delay is shown to the satisfaction of the Commissioner to have been unavoidable." 37 C.F.R. § 1.378(b)(3) provides that a petition to accept an unavoidably delayed payment of a maintenance fee must include, inter alia:

> A showing that the delay was unavoidable
> since reasonable care was taken to ensure that
> the maintenance fee would be paid timely and



that the petition was filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent. The showing must enumerate the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly.

A patent owner's failure to pay a maintenance fee may be considered to be "unavoidable" if the patent owner "exercised the due care of a reasonably prudent person." Ray v. Lehman, 55 F.3d 606, 608-09 (Fed. Cir.), cert. denied, 516 U.S. 916, 116 S. Ct. 304 (1995). This determination is to be made on a "case-by-case basis, taking all the facts and circumstances into account." Smith v. Mossinghoff, 671 F.2d 533, 538 (D.C. Cir. 1982).

With the above standards in mind, it is respectfully submitted that the failure to pay the maintenance fees of the '890 Patent was unavoidable.

Petitioner respectfully submits that he acted as a reasonably prudent patentee in relying upon his patent attorney as to matters relating to the '890 Patent and especially with regard to communications with the PTO. A reasonably prudent patentee unfamiliar with patent practices and procedures would have retained a patent attorney and entrusted such responsibilities relating to a patent to his attorney -- as did Millman.

Additionally, Petitioner respectfully submits that had he received the above-referenced July 14, 1999-letter or otherwise had

understood that a maintenance fee was required, Petitioner would have taken steps to ensure that the maintenance fees for the '890 Patent were timely paid. (Millman Decl. at ¶ 8.) Indeed, during their relationship, Millman had always been responsible in connection with matters requested of him by Maleson and stayed current with his attorneys' fees, invoices and fees payable to the PTO and/or others. (Millman Decl. at ¶ 5; Maleson Decl. at ¶ 12.)

Petitioner also submits that Maleson acted reasonably in relying upon his docketing system to ensure timely payment of the maintenance fees. The docketing system employed by Maleson was sufficiently reliable. Maleson had never encountered any errors in connection with his docketing system.

With respect to the '890 patent in particular, while following his regular practice, Maleson prepared a letter on July 14, 1999, advising Millman of the requirement to pay the first maintenance fee. However, Maleson did not know that Millman never received this letter. After a thorough investigation, Millman has found no existence or reference to the July 14, 1999-letter. On the other hand, Maleson's records reveal an unsigned, electronic copy of his July 14, 1999-letter which was retrieved from an archived backup diskette. However, it is still unknown whether this letter was ever mailed to Millman, and if so, whether it was misplaced by the U.S. Post Office. It was Maleson's standard practice to mail such a letter to his clients when a maintenance fee was due. While

Maleson has no current recollection of whether such a letter was mailed, he has no reason to believe that he deviated from his normal and regular practice of mailing such a letter. If there was a mistake made by Maleson in not mailing the July 14, 1999-letter to Millman, this mistake would have been an error on Maleson's part. However, it was not an error in which Maleson, as a reasonably prudent attorney under the circumstances, could have expected at that time.

In addition, Petitioner respectfully submits that he took prompt, affirmative steps to reinstate the '890 patent once he was advised that the '890 Patent had lapsed. Upon learning of the lapse, Petitioner collected and searched through all of his files and those that had been recovered from Maleson. In addition, Millman retained two separate counsel to investigate the matter on his behalf and to contact Maleson. As soon as the investigation was complete, Petitioner sought reinstatement by filing the instant petition.

In light of the foregoing, it is respectfully submitted that the failure to pay the maintenance fees for the '890 Patent was unavoidable. Petitioner respectfully requests that the delayed payment of these fees be accepted and the '890 Patent reinstated.



Respectfully submitted,

CAESAR, RIVISE, BERNSTEIN,
COHEN & POKOTILOW, LTD.

February 9, 2004

By _____
    Manny D. Pokotilow
    Registration No. 22,492
    12th Floor – Seven Penn Center
    1635 Market Street
    Philadelphia, PA 19103-2212
    (215) 567-2010

    Attorney for Petitioner
    Norman A. Millman

-10-



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Patent No. | : | 5,481,890 |
| Inventor | : | Norman A. Millman |
| Issue date | : | January 9, 1996 |
| Application No. | : | 029,545 |
| Filed | : | March 11, 1993 |

RECEIVED

FEB 1 2 2004

OFFICE OF PETITIONS

## DECLARATION OF PAUL MALESON

I, Paul Maleson, declare as follows:

1.    I am a former Assistant Examiner with the PTO (1953-55), and since 1955 have been an active patent attorney in private practice.

2.    I represented Norman A. Millman and his company, Trans-Atlantic Co., on a regular on-going basis for a number of years in patent and trademark matters. In or around late 1992-early 1993, Mr. Millman requested that I prepare, file and prosecute the application that led to U.S. Patent No. 5,481,890 (the "'890 Patent"). At that time, I was a member of the firm of Maleson, Rosenberg, Bilker & Farrell in Philadelphia, PA.

3.    On or about January 16, 1996, I received the formal ribbon copy for the '890 Patent. As was my standard practice, I prepared a letter advising Mr. Millman the receipt of the patent. I mentioned in this letter the requirement to pay a first maintenance fee to the PTO in order to keep the '890 Patent in effect. I also stated in the letter that the deadline for payment was January 9, 2000, and that I would attempt to notify him when the payment was due. . While I no longer possess the files relating to this matter or any other matter of Mr. Millman and Trans-Atlantic Company (as noted below), during a lengthy search of my records, I was able to find an unsigned, electronic copy of this letter on archived backup diskettes. A printout of the unsigned, electronic copy of the letter

is attached as Exhibit I.

4.    In 1998, I became a sole practitioner with several "of counsel" associates

5.    While a sole practitioner, the control established by me to manage maintenance fees for my clients is a docketing system that I administer. This system primarily consists of an electronic "due list" on my computer. For each item, this list includes identifying information, notation of the type of Action or Response due, and the "first date" and "last date" involved. The list is kept sorted by "first date" with the nearest of those dates at the top of the list. There is no time limit for entries. The list is opened and updated each time a step is taken. If some later step is due (either by me or the PTO), the new date and type entries for that matter replace the former entries, and the list is sorted as described above. If no further steps are in order, the entire entry line is deleted. It is routinely consulted at once a month, usually toward the end of a month. If a step ("first date")is due in the ensuing month, I routinely print out the list for my desktop. For the ensuing month, I make a pencil notation on a desktop calendar/planner, marking the first due date and one week prior to that date. The working file(s) pertaining to the particular matter, which contains the documents, including copies of correspondence with the patentee or other client and/or the PTO, has a docket history on the cover, including any due date.

6.    When a new patent issues, new entries regarding the next-due maintenance fees are entered on the appropriate dates on the electronic calendar and the relevant file for the patent, as described above. In addition, I routinely note the next-due maintenance fee year, month and day due date on the last page of the current year's monthly calendar to be transferred forward year by year to the monthly paper calendars as appropriate.

7.    If a maintenance fee is due, a letter or provisional bill is sent to the patentee or

assignee, advising him and requesting whether the payment should be made. I comply with the instructions given. If I am not to pay the maintenance fee, I delete the entries applicable to the patent from the above-mentioned calendars. If I am instructed to pay the maintenance fee, I send a transmittal letter to the PTO along with a check in the amount of the maintenance fee.

8.      My docketing system is reliable. I never encountered any faults in this docketing system. To the best of my recollection, I have never improperly failed to pay a maintenance fee I was instructed to pay.

9.      In July 1999, as was my practice, I inspected my calendars to determine whether any maintenance fees were due. I observed that the first maintenance fee was then due for the '890 patent, and accordingly, I prepared a letter on or about July 14, 1999 advising Mr. Millman of the same. While I have no current recollection of whether such a letter was mailed, I have no reason to believe that I deviated from my normal practice which was to send this letter to Mr. Millman. A search of my records shows the existence of an unsigned, electronic copy of this letter on my archived backup diskettes. A printout of the unsigned electronic copy of this letter is attached as Exhibit 2.

10. After receiving no response from Mr. Millman regarding the maintenance fee, I believed that Mr. Millman had no intention of having me maintain the '890 Patent.

11.     In 2000, Mr. Millman requested that all the Trans-Atlantic (Millman) files be delivered to an attorney he specified, who happened not to be a patent attorney. I complied with Mr. Millman's request and delivered those files as requested. I deleted the Millman/Transatlantic files from my working hard drive, but kept the archived backup diskette copies of documents originating from my office, and had no further contact with Mr. Millman.

-3-

12.   During our relationship, Mr. Millman has always been responsive to assist
with matters requested of him.  In addition, Mr. Millman stayed reasonably current with his
attorneys' fees.

13.   In October 2003 and January 2004, I was contacted by Harold H. Fuller and Manny
D. Pokotilow, respectively, on behalf of Mr. Millman regarding the circumstances surrounding the
'890 Patent.  I promptly searched the archived backups and was able to provide copies of the letters
marked Exhibits 1 and 2. Unfortunately, during this time period, I have been largely unavailable and
out of my office, as I have been incapacitated due to a severe back ailment.

I further declare that all statements made herein of my knowledge are true and that all
statements made on information and belief are believed to be true; and further, that these statements
were made with the knowledge that willful false statements and the like so made are punishable by
fine or imprisonment or both under Section 1001 of Title 18 of the United States Code and that such
willful false statements may jeopardize the validity of this document or any patent resulting
therefrom.

Dated: February 4, 2004

Paul Maleson

−4−

January 16, 1996

EXPRESS MAIL

Mr. Norman A. Millman
536 Cardinal Drive
Dresher, PA 19025

Re: U. S. Patent 5,481,890, Granted January 9, 1996
"Cylindrical Lockset Knob To Lever Conversion Assembly"

Dear Norman:

We have just received in the mail today the formal patent deed for your above-identified patent. It is enclosed herewith. It should be kept among your valuable papers, although even if it should be lost or destroyed, your actual legal rights would not be damaged.

In addition, also enclosed are additional printed copies of the inside technical pages of the patent. I have kept several of these extra copies for your files at my office. It is perfectly all right for you to make additional photocopy reproductions of either the informal copies or the original patent deed with its seal etc. I can also order additional printed copies, but office photocopy reproductions are just as satisfactory.

As I told you before, it is preferable to apply the patent number on all products that are covered under the patent. I have explained the potential advantage of this, in making it easier to collect full damages from infringers under certain circumstances.

This patent is effective for preventing others from making, using, or selling anything covered in it in the United States and its territories and possessions. Thus, an infringing product, regardless of where manufactured, is subject to being stopped from being sold or used in the United States, and under some circumstances, infringing articles can be stopped at Customs.

As you know, anybody in the world can now obtain a copy of the patent.


EXHIBIT

Norman A. Millman
January 15, 1996
Page 2

        Between three and a half and four years after the Issue
Date, there is a first Maintenance Fee to be paid to the U.S.
Patent Office in order to keep the patent in effect.  If
Maintenance Fees are not paid by the due date or any permissible
extension, the patent becomes unenforceable against infringers,
but does remain as a document that would prevent any other party
from getting a patent on the identical subject. It is our present
intent to attempt to notify you when the first Maintenance Fee is
due, but the client takes primary responsibility for being aware
when Maintenance Fees are due. The first Maintenance Fee deadline
will be January 9, 2000.

        My congratulations on obtaining this patent.

                        Best regards,


                        Paul Maleson


PM:kkc
Enclosures


B:\NW1L116.LTR.0116960240



July 14, 1999

Mr. Norman A. Willman
536 Cardinal Drive
Dresher, PA 19025

Re:  U. S. Patent 5,481,890, Granted January 9, 1996
"Cylindrical Lockset Knob To Lever Conversion Assembly"

Dear Norman:

The period for paying the First Maintenance Fee to the government opened July 9. You may recall from my transmittal letter of January 16, 1996 (copy enclosed) that the deadline is January 9, 2000. The government fees change from time to time, but at present the Small Entity First Maintenance Fee is $470. If you wish me to take the steps to keep the patent in effect, you should make out a check to "Commissioner of Patents and Trademarks" in that amount and send it to me.

Best regards,

Paul Maleson

Enc.
PM:st
R:\WMIL714.LTR.0714990321


EXHIBIT
2



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent No.              :    5,481,890

Inventor                :    Norman A. Millman

Issue date              :    January 9, 1996

Application No.         :    029,545

Filed                   :    March 11, 1993

## DECLARATION OF NORMAN A. MILLMAN

I, Norman A. Millman, declare as follows:

1.   I am the inventor and owner of the above-referenced patent.

2.   In late 1992-early 1993, I retained Paul Maleson, Esq. -- a patent attorney and then a member of the firm of Maleson, Rosenberg, Bilker & Farrell -- to provide representation in connection with certain patent matters for me, including the prosecution of the application that led to U.S. Patent No. 5,481,890 (the "'890 Patent"). Because I was not familiar with patent practices and procedures, I relied upon Mr. Maleson with respect to all matters relating to the '890 Patent, including all communications with the PTO.

3.   On or about January 16, 1996, Mr. Maleson sent me a letter, advising me that he had just received the formal ribbon copy of the '890 Patent. In addition, Mr. Millman stated in the letter that a maintenance fee was required to be paid to the PTO in order to keep the '890 Patent in effect, and that Mr. Maleson would attempt to contact me when the fee was due. While I did receive

this letter and the ribbon copy of the patent, I did not understand from these materials that any obligation was required of me in connection with the '890 Patent. All that I understood at that time was that the '890 Patent had issued, that Mr. Maleson would be responsible for any communications with the PTO and that he would counsel me in this regard.

4. It is my understanding that Mr. Maleson believes to have sent to me a letter on or about July 14, 1999 informing me that the first maintenance fee was due for the '890 patent. I do not recall ever receiving this letter. Moreover, according to and consistent with my records, I never received such a letter from Mr. Maleson. In addition, a copy of this letter was not in the files that I had received from Mr. Maleson in or around October 2000.

5. During my relationship with Mr. Maleson, I had always been diligent in connection with the matters requested of me and stayed current with his invoices, attorneys' fees and fees payable to the PTO and/or others.

6. In or around October 2000, I terminated my relationship with Mr. Maleson, and I requested that all of my files be returned to me. Maleson complied and delivered the files to me via an intermediary. Once I received the files from Mr. Maleson, I placed them in storage for safekeeping.

7. In or around October 2003, I contacted Harold H. Fuller, Esq. regarding an invention which was an improvement upon the

-2-



invention that was the subject of the '890 Patent. During our dialogue, Fuller had discovered that the '890 Patent had lapsed for failure to pay the first maintenance fee, and he advised me of the same. Upon learning of the lapse, I collected and searched through all of the files taken back from Mr. Maleson and through my own records. In addition, Mr. Fuller investigated the matter on my behalf by ordering a copy of the file history of the '890 Patent and attempting to contact Mr. Maleson. Thereafter, I retained my present counsel, Manny D. Pokotilow, to further investigate the matter. This investigation into the facts surrounding the failure to pay the maintenance fees for the '890 Patent involved a considerable amount of time, due in large part to the unavailability of Mr. Maleson, who I understand has been disabled due to a severe back ailment for the past few months.

8.    Until I was advised by Mr. Fuller that the '890 Patent had lapsed, I was unaware of, and did not understand, the requirement to pay any fees to keep the '890 Patent from expiring. Had I received the above-mentioned July 14, 1999-letter from Mr. Maleson or otherwise been aware of the requirement to pay maintenance fees, I would have taken steps to ensure that the maintenance fees for the '890 Patent were timely paid.

I further declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements

-3-

 

were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment or both under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of this document or any patent resulting therefrom.

Dated: February 6, 2004

_____
Norman A. Millman